Floyd W. Bybee, #012651
**BYBEE LAW CENTER, PLC**
90 S. Kyrene Rd., Ste. 5
Chandler, AZ 85226-4687
Office: (480) 756-8822
Fax: (480) 302-4186
floyd@bybeelaw.com

Attorney for Plaintiff

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Jannel Vargas;<br><br>    Plaintiff,<br><br>v.<br><br>National Credit Systems, Inc.;<br><br>    Defendant. | No.<br><br>**COMPLAINT**<br><br>(Jury Trial Demanded) |

**I. Preliminary Statement**

1. Plaintiff brings this action for damages based upon Defendant's violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq*. In the course of attempting to collect a debt allegedly owed by Plaintiff, Defendant engaged in deceptive, unfair and abusive debt collection practices in violation of the FDCPA. Plaintiff seeks to recover actual damages and statutory damages, together with reasonable attorney's fees and costs.

## II. JURISDICTION

2. Jurisdiction of this Court, over this action and the parties herein, arises under 15 U.S.C. § 1692k(d) (FDCPA), and 28 U.S.C. § 1331. Venue lies in the Phoenix Division of the District of Arizona as Plaintiff's claims arose from acts of the Defendant perpetrated therein.

## III. PARTIES

3. Plaintiff is a natural person who resides in Maricopa County, Arizona.
4. Plaintiff is allegedly obligated to pay a debt which was incurred for personal, family, or household purposes.
5. Plaintiff is a "consumer" as that term is defined by FDCPA § 1692a(3).
6. Defendant National Credit Systems, Inc. ("NCS") is a Georgia corporation registered to do business within the state of Arizona.
7. NCS is licensed by the Arizona Department of Financial Affairs as a collection agency, license number 0904223.
8. NCS collects or attempts to collect debts which have been assigned to it after default.
9. NCS is a "debt collector" as that term is defined by FDCPA § 1692a(6).

## IV. Factual Allegations

10. In 2014, Plaintiff rented an apartment from The Villas at Camelback Crossing ("Villas").
11. Plaintiff moved out of the apartment in April 2016.

12. At the time Plaintiff moved out, Villas claimed that she owed a balance of $1,054.32 for various charges (hereinafter referred to as the "Villas Debt" or "Debt").

13. The Debt was incurred for personal, family, or household purposes.

14. Upon information and belief, Villas assigned the Debt to NCS for collection purposes.

15. Sometime before July 28, 2016, NCS telephoned Plaintiff concerning the collection of the Villas Debt.

16. This call was the first communication received by Plaintiff from NCS concerning the collection of the Debt.

17. During this phone call, NCS informed Plaintiff that she owed a balance to the Villas, which Plaintiff emphatically disputed.

18. In response to Plaintiff's oral dispute, NCS sent Plaintiff a letter dated July 28, 2016, along with some documents from Villas. (A copy of the letter without the documents is attached hereto as Exhibit A).

19. The July 28, 2016 letter was the first written communication from NCS to Plaintiff concerning the Villas Debt.

20. The July 28, 2016 letter did not contain the verification / validation notice as required by 15 U.S.C. § 1692g.

21. Shortly after receiving the July 28, 2016 letter, Plaintiff telephoned NCS and spoke with its collector Harold Sanders.

22. During this conversation, Mr. Sanders told Plaintiff that if she failed to pay the debt in full, or refused to set up payment arrange-

ments, that NCS would report the Debt to the credit reporting agencies.

23. At that time Plaintiff had been working to clear up her credit with the hope that she could qualify to purchase a home for herself and child.

24. To avoid having her credit erroneously damaged, Plaintiff agreed to a monthly payment arrangement with Mr. Sanders in order to avoid having the Villas Debt reported to her credit report.

25. Plaintiff provided Mr. Sanders with the account information for her Chase bank account, with the understanding NCS would take the automatic monthly withdrawals of approximately $62 on the 19th of every month beginning on August 19, 2016.

26. In August 2016, NCS attempted to make the automatic withdrawal from Plaintiff's bank account, but it did not go through.

27. On August 31, 2016, Mr. Sanders called Plaintiff concerning the payment.

28. It was discovered during this call, that NCS had previously taken down the wrong account number, which was corrected.

29. During this call, Plaintiff authorized NCS to take the August 2016 payment of $60.32.

30. On or about September 15, 2016, Mr. Sanders called Plaintiff again alleging that the automatic withdrawal for September was declined.

31. At the time of the call, the September 2016 payment was not yet due.

32. Notwithstanding, Plaintiff agreed to make the payment at that time with the understanding that NCS would not take an additional payment that month.

33. Mr. Sanders assured her that no other payment would be withdrawn until October 2016.

34. Nevertheless, on September 20, 2016, NCS withdrew an additional $62.33 from Plaintiff's Chase bank account.

35. In October 2016, NCS sent Plaintiff a letter dated October 17, 2016 concerning her October 2016 payment. (A copy of this letter is attached as Exhibit B).

36. NCS stated in the October 17, 2016 letter that:

> Your check for $62.33 was returned to us by your bank.
>
> This letter shall serve as official notification that certified funds are due immediately to remedy this matter. This letter may serve as your only notification of this matter. Your response to this notification is required immediately. If a response is not received, National Credit Systems will immediately pursue remedies under Federal and State Law.
>
> Time is of the essence.

37. Plaintiff contacted her bank and confirmed that NCS had not attempted an automatic withdrawal from her account.

38. Plaintiff also confirmed with her bank that there were sufficient funds available at all relevant times to cover any automatic withdrawal from NCS.

39. After receipt of the October 17, 2016 letter, NCS made an automatic withdrawal of $62.13 on October 20, 2016.

- 5 -

40. In November 2016, NCS failed to take its monthly withdrawal from Plaintiff's Chase bank account.

41. On November 16, 2016, Plaintiff spoke again with Mr. Sanders and informed him that there were sufficient funds available for the November 2016 payment.

42. Mr. Sanders asked Plaintiff to forward copies of her bank statements showing that the balance was sufficient for any withdrawal by NCS.

43. On November 16, 2016, Plaintiff emailed Mr. Sanders copies of her bank statements.

44. Mr. Sanders never responded or called Plaintiff back.

45. On November 22, 2016, NCS processed its automatic withdrawal in the amount of $62.13.

46. In December 2016, NCS mailed Plaintiff a letter dated December 16, 2016. (A copy of the letter is attached hereto as Exhibit C).

47. The December 16th letter stated:

> Your check for $62.33 was returned to us by your bank.
>
> This letter shall serve as official notification that certified funds are due immediately to remedy this matter. This letter may serve as your only notification of this matter. Your response to this notification is required immediately. If a response is not received, National Credit Systems will immediately pursue remedies under Federal and State Law.
>
> Time is of the essence.

48. Plaintiff again contacted her bank and verified that NCS had not attempted any automatic withdrawal from her account in Decem-

- 6 -

|   |   |   |
|---|---|---|
| 1 |     | ber 2016. |
| 2 | 49. | Plaintiff also confirmed with Chase that she had sufficient funds in |
| 3 |     | her account for all relevant times available to cover any automatic |
| 4 |     | withdrawal from NCS. |
| 5 | 50. | NCS also sent a letter to Plaintiff dated December 17, 2016. (A copy |
| 6 |     | of this letter is attached as Exhibit D). |
| 7 | 51. | The December 17th letter stated that: |

>  Dear JANNEL VARGAS,
>
> We regret that you have failed to make suitable arrangements concerning the above referenced obligation.
>
> Be advised, we are processing this account for placement on your credit history with all three national credit bureaus. If so reported, your ability to obtain credit, rent, or secure favorable interest rates may be affected for seven years from the date of delinquency.
>
> However, it is not too late for us to place a hold on your account if you act now. You may be able to avoid adverse credit reporting entirely if we can work out a reasonable arrangement.
>
> Our representatives will take your individual situation into consideration.
>
> We urge you to contact our office before this debt is placed on your credit record and to avoid other collection remedies available under the law.

52. At the time NCS sent the December 17th letter, Plaintiff had made each and every monthly payment which had become due under her agreement with NCS.

53. At the time NCS sent the December 17th letter, NCS had failed to take the scheduled authorized withdrawals from Plaintiff's bank

      account which led to any alleged default on their agreement.

54. Upon information and belief, at the time NCS sent the December 17th letter, or at the latest by the time Plaintiff received the December 17th letter, NCS had already reported the Villas Debt to Plaintiff's credit reports.

55. On January 3, 2017, Plaintiff telephoned NCS and spoke with Mr. Sanders to ask why NCS had stopped taking the automatic withdrawals.

56. During this call, Mr. Sanders was very rude and repeatedly spoke over Plaintiff preventing her from explaining that the payments had all been made, and also that NCS had repeatedly failed to take the payments pursuant to the agreement.

57. During this call, Mr. Sanders told Plaintiff that unless she paid the full balance immediately, he would "leave it up to the legal team," and then disconnected the call.

58. NCS sent a letter to Plaintiff dated January 25, 2017. (A copy of this letter is attached as Exhibit E).

59. The January 25th letter stated that:

> Dear JANNEL VARGAS,
>
> Your refusal to make suitable arrangements to satisfy the above referenced debt has resulted in your account being reviewed for additional recovery options available to our client in your state. Our company has already reported this account to all three national credit bureaus, which is likely affecting your ability to obtain credit, rent, or secure favorable interest rates.
>
> If voluntary payment on this account is not made, we may recommend that our client pro-

> ceed with additional collection remedies available to them under the law. If our client initiates a lawsuit and obtains a court judgment against you, they may pursue their lawful recovery options, which may include any or all of the following, based upon legal procedures allowed in your state:
>
> 1. Garnishment of wages (states excluded: NO, SO, PA, TX).
>
> 2. Liens placed on property including: Automobiles, Real estate, or Other real property
>
> 3. Seizure & auction of personal property
>
> To avoid further costly collection activity, it is imperative you contact me immediately.
>
> Otherwise, you may submit payment for this account through our website (www.natlonal-creditsystems.com), by mail, or with our office over the phone.

60. At the time NCS sent Plaintiff the January 25th letter, it did not have permission from the Villas to threaten legal action against Plaintiff.

61. At the time NCS sent Plaintiff the January 25th letter, it had no intention of bringing legal action against Plaintiff to collect the Villas Debt.

62. At the time NCS sent Plaintiff the January 25th letter, it had no intention of garnishing Plaintiff's wages.

63. At the time NCS sent Plaintiff the January 25th letter, it had no intention of placing any liens on Plaintiff's property, including automobiles, real estate, or other real property.

64. At the time NCS sent Plaintiff the January 25th letter, it had no intention of seizing and auctioning off any of Plaintiff's personal

1 property to satisfy the Villas Debt.

2 65. At no time did NCS notify Plaintiff in writing, not more that ten nor less than three business days, prior to submitting any automatic withdrawal from Plaintiff's bank account.

66. As a result of Defendant's actions as outlined above, Plaintiff has suffered actual damages including, but not limited to, emotional distress, anxiety, worry, invasion of privacy, and other extreme emotional distress.

67. Defendant's actions as outlined above were intentional, willful, and in gross or reckless disregard of Plaintiff's rights, and part of Defendant's persistent and routine practice of debt collection.

68. In the alternative, Defendant's actions were negligent.

## V. Causes of Action

### a. Fair Debt Collection Practices Act

69. Plaintiff repeats, realleges, and incorporates by reference the foregoing paragraphs.

70. Defendant's violations of the FDCPA include, but are not necessarily limited to, 15 U.S.C. §§ 1692d, 1692e, 1692e(2)(A), 1692e(5), 1692e(8), 1692e(10), 1692f, 1692f(2), and 1692g.

71. As a direct result and proximate cause of Defendant's actions taken in violation of the FDCPA, Plaintiff has suffered actual damages.

## VI. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that judgment be entered against

1  Defendant for:

2      a)    Actual damages under the FDCPA;

3      b)    Statutory damages under the FDCPA;

4      c)    Costs and reasonable attorney's fees pursuant to the FDCPA; and

6      d)    Such other relief as may be just and proper.

8  DATED __February 9, 2017__.

10                                   s/ Floyd W. Bybee
Floyd W. Bybee, #012651
**BYBEE LAW CENTER, PLC**
90 S. Kyrene Rd., Ste. 5
Chandler, AZ 85226-4687
Office: (480) 756-8822
Fax: (480) 302-4186
floyd@bybeelaw.com

Attorney for Plaintiff